IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:10CR45 |
| Plaintiff, ) | |
| ) | |
| vs. ) | FINDINGS AND |
| ) | RECOMMENDATION |
| MACK L. NASH, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the motion to suppress (Filing No. 14), as amended (Filing No. 16), filed by defendant Mack L. Nash (Nash). Nash is charged with possession of a firearm, a Model A-80 Astra .45 caliber pistol, after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). See Filing No. 1 - Indictment. Nash seeks to suppress any statements made or evidence seized from him stemming from his contact with law enforcement officers on January 12, 2010. Nash filed a pre-hearing brief (Filing No. 15) in support of the motion. The government filed a pre-hearing brief (Filing No. 18) in opposition to the motion.

On September 28, 2010, the court held an evidentiary hearing on Nash's motion. Nash was present with his appointed counsel, Assistant Federal Public Defender Richard H. McWilliams. Assistant United States Attorney Michael D. Wellman represented the United States. During the hearing, the court heard testimony from Omaha Police Department (OPD) Officers Brent Kendall (Officer Kendall) and Anthony Desciscio (Officer Desciscio). See Filing No. 20. The court received into evidence three photographs (Exs. 1, 101, and 102) and two audio files (Exs. 103 and 104). See Filing No. 21. A transcript (TR.) of the hearing was filed on October 5, 2010. See Filing No. 24. The defendant filed Proposed Findings of Fact (Filing No. 25) on October 13, 2010, whereupon the matter was deemed submitted.

## FINDINGS OF FACT

Officers Kendall and Desciscio have been employed with the OPD for approximately two and one-half years (TR. 4, 42). Prior to his employment with the OPD, Officer Kendall worked for the Madison County Sheriff's Office in Nebraska (TR. 4). Officer Kendall is a graduate of the Omaha Police Training Academy and the Grand Island Police Training Academy, and holds a certificate to act as a peace officer in the state of Nebraska (TR. 4-5). Officer Desciscio is a graduate of the Omaha Police Training Academy and holds a certificate to act as a peace officer in the state of Nebraska (TR. 42-43).

On January 12, 2010, at approximately 2:53 a.m., Officer Kendall was in uniform in a marked cruiser, using call sign one Adam 64, near the Southeast Assembly at 24th and Vinton streets (TR. 5, 15). Officer Kendall received a dispatch to 5519 South 30th Street to investigate a 911 call reporting an armed party (TR. 5-6, 16-17, 53). The dispatch stemmed from a 9-1-1 call where a female caller stated, "please get here, he has a gun," the caller stated she did not know the man and did not state his race or describe his clothing other than that the man was wearing an orange hat (Ex. 104). The dispatcher stated, "all cars check an armed party 5519 South 30th Street female caller stated, 'please get here, he has a gun,' male is in an orange hat" (Ex. 103 2:50-3:08). After relaying the statements made by the female caller, the dispatcher added the call was made by a cellular telephone, the caller hung up, and did not answer on callback (TR. 17; Ex. 103 2:50-3:08).

Officer Kendall arrived at the location on 30th Street within one to three minutes (TR. 6). Officer Kendall, the first to arrive, was alone in his vehicle, but other officers soon arrived at the scene (TR. 6, 15, 22-23). Officer Desciscio traveled from 16th and Nicholas streets when he heard the dispatch regarding an armed person with an orange hat (TR. 43-44). Officer Desciscio arrived within three minutes in a marked cruiser with another officer (TR. 43-44).

The location, 5519 South 30th Street, is a separately-numbered residence in a row of apartment-type residences in a multiple-dwelling building (TR. 6, 21-22; Ex. 1). The apartments are known as Southside Terrace (TR. 32-33, 60). Officers Kendall and Desciscio had heard Southside Terrace was a location with gang activity and having a predominant gang called the South Family Bloods (TR. 33, 69). In the officers' experience

gang members may wear certain colors or types of clothing, including sports' team apparel, to signify gang affiliation (TR. 33, 69).

Officer Kendall parked his vehicle on the east side of 30th Street, north of the target residence (TR. 7, 23). Officers Kendall and Desciscio walked between the building with the target location and a building to its north, heading east to approach the target residence from the back (TR. 8, 22, 45). Behind the residence, and surrounded by several buildings, was a common area including a yard, playground equipment, and a parking lot (TR. 25-26, 60). At the time, the area was clear and well-lighted (TR. 74). Two officers accompanied Officers Kendall and Desciscio, while additional officers approached the front of the target residence and the rear of the building from the south (TR. 8-9, 25, 45).

The officers saw a male in dark clothing standing several yards from, but adjacent to, the back door of the target residence (TR. 9, 57). The man, later identified as Nash, was wearing a multi-colored hat (TR. 9). The hat contained the color orange (TR. 9). Nash was alone in the area (TR. 67). Officer Kendall did not recognize Nash, but saw him from the back at about ten to twenty yards away (TR. 9, 27). The officers shouted for Nash to "stop" and "show your hands" (TR. 10, 46). Nash did not comply, but began to walk east, with his back to the officers, through fresh, mostly undisturbed snow, which was approximately one foot deep (TR. 10). Nash paused approximately twenty yards from the back door of the target residence, but did not raise his hands, which were positioned in front of his body (TR. 10-11, 37-38, 46; Ex. 101). Nash's hands were not visible to the officers (TR. 10-11). Nash then continued walking east approximately fifty yards (TR. 11, 47). Nash stopped walking and complied with the officers' commands to get on the ground (TR. 11).

Officer Desciscio was the first officer to reach Nash (TR. 47). Officer Desciscio placed Nash in handcuffs to detain Nash for the investigation (TR. 11, 47). Once Officer Desciscio saw Nash's face, Officer Desciscio recognized Nash by name based on bulletins related to gang activity (TR. 49-50). Officer Desciscio also knew Nash had a prior felony conviction (TR. 50). Officer Desciscio walked Nash toward a police cruiser (TR. 48). At that time, Nash became "very belligerent, yelling . . . several profanities, racial slurs, threats" (TR. 48). At one point, Nash attempted to get away from Officer Desciscio, at which time Officer Desciscio took Nash to the ground (TR. 48-49). Nash continued to "scream

profanities" and, although no gun had yet been located, Nash said, "you don't got that gun on me" and "I ain't put no gun in the snow. What do you got on me?" (TR. 48, 51-52). Nash did not make these statements in response to questions from Officer Desciscio (TR. 49). Officer Desciscio placed Nash under arrest for disorderly conduct and conducted a pat-down prior to placing Nash in a police cruiser (TR. 48-49).

Officer Kendall traced Nash's path through the snow to determine whether Nash dropped anything (TR. 12). Officer Kendall was the first officer to walk through that area of snow (TR. 13). Officer Kendall found a black semiautomatic handgun in the snow in the middle of the path at the location where Nash paused approximately twenty yards from the residence (TR. 12). The handgun was lying directly on the ground, but was visible from above (TR. 14). The handgun was not covered with snow, but was wet and cold (TR. 14). Officer Kendall observed a few other footprints in the snow in the area of the gun (TR. 13). Officer Kendall informed the other officers about locating the handgun after Nash had been placed in a police cruiser (TR. 49).

## LEGAL ANALYSIS

The defendant argues the officers lacked any reasonable articulable suspicion to initiate a *Terry* stop. Specifically, the defendant contends the dispatch did not contain enough information to justify officers making contact with Nash. Additionally, the defendant contends the stop quickly turned into a custodial arrest without probable cause. The government argues the officers had legal justification for the initial stop. Further, the government asserts Nash's behavior when he created a disturbance justified his detention and ultimate arrest.

"Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). When evaluating "each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing" the court "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S.

266, 273-74 (2002) (**quoting** *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The government has the burden to prove justification existed for any restraint on the defendant. **See** *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004).

One type of encounter between the police and a citizen is an investigative detention, which is a seizure of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity. **See, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. 1 (1968); *Griffith*, 533 F.3d at 983-84; *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007). An officer is allowed to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *Saenz*, 474 F.3d at 1136 (**citing** *Terry*, 392 U.S. at 30). "Any detention consequent to an investigative stop must be temporary and must last no longer than necessary." *United States v. Dickson*, 58 F.3d 1258, 1263 (8th Cir. 1995). "In deciding whether a detention lasts too long to be justified in an investigative stop, and therefore becomes an arrest, we consider whether the police 'diligently pursued' a means of investigation likely to resolve their suspicions quickly." *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "Generally, the police may take reasonably necessary steps to 'maintain the status quo of a situation while verifying or dispelling suspicion.'" *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)).

"In making reasonable-suspicion determinations, reviewing courts must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Martinez-Cortes*, 566 F.3d 767, 769 (8th Cir. 2009) (internal quotation and citation omitted). "Reasonable suspicion must be supported by 'specific and articulable facts.'" *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) (**citing** *Terry*, 392 U.S. at 21). "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed in its totality."

*United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001); **see** *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008). The Supreme Court has held

> "[T]here could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." Indeed, *Terry* itself involved "a series of acts, each of them perhaps innocent" if viewed separately, "but which taken together warranted further investigation." [Further] . . . "innocent behavior will frequently provide the basis for a showing of probable cause," and . . . "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." That principle applies equally well to the reasonable suspicion inquiry.

*United States v. Sokolow*, 490 U.S. 1, 9-10 (1989) (internal citations omitted). "[A] stop typically is justified when a suspect matches the description of a person involved in a disturbance near in time and location to the stop." *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010).

The officers suspected Nash was the armed subject of the 9-1-1 call. The officers' suspicions were based on Nash's proximity to the residence of the person who made the 9-1-1 call and Nash's hat. The defendant argues these two facts are constitutionally insufficient. However, under the circumstances, the court finds the officers acted reasonably in conducting a *Terry* stop of Nash. Nash was alone near the residence at about 3:00 a.m. within minutes of the dispatch reporting a man with a gun. Although Nash's hat was not completely orange, the hat contained the color orange. The fact the officers did not have additional identifying information is insignificant where they find an individual in such close proximity to the location of the report. Further, Nash's appearance, with orange in his hat, is not inconsistent with the dispatch report. Based on the totality of the circumstances, the court finds a reasonable articulable suspicion existed to justify Nash's investigatory stop and temporary detention. **See** *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (finding reasonable suspicion existed based primarily on the "temporal and geographic proximity of the car to the scene of the crime, the matching description of the vehicle, and the time of the stop"). Further, the detention was directly related to the purpose of the *Terry* stop, to ascertain whether Nash was the individual

reported to have a. **See *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984)** ("The [*Terry*] stop and inquiry must be reasonably related in scope to the justification for their initiation."). Because the court finds the initial contact did not violate Nash's constitutional rights, the subsequently obtained evidence should not be suppressed on that basis.

Nash exhibited unusual behavior when he walked away, paused, and then continued to walk away from several officers who were shouting commands at him. This behavior justified, if any justification were necessary, the officers' continued interest in Nash. **See *United States v. Binion*, 570 F.3d 1034, 1039 (8th Cir. 2009)** (noting the defendant's "behavior must be considered as a whole and in the light of the officers' experience and specialized training"). Further, the officers were justified in acting to place Nash in handcuffs based on the information received from dispatch about the individual being armed, coupled with Nash's unusual actions and failure to comply with the officers' commands. **See *Binion*, 570 F.3d at 1039** (holding a protective frisk is warranted when suspect is potentially armed); ***United States v. Walker*, 555 F.3d 716, 721 (8th Cir. 2009)** ("Protective searches allow for the use of handcuffs."); ***United States v. Robinson*, 119 F.3d 663, 667 (8th Cir. 1997)** (noting suspect moving hands toward waist supported reasonable suspicion he had a firearm). Nash's statements and conduct when moving toward the police cruiser provided probable cause for his arrest for disorderly conduct. **See *Binion*, 570 F.3d at 1040**. Nash's conduct and arrest provide legal justification for the officers' search of Nash. **See *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir. 2010)**.

In any event, the officers lawfully seized the handgun. "Any expectation of privacy in property 'is forfeited upon its abandonment.'" ***United States v. Voice*, 622 F.3d 870, 878 n.3 (8th Cir. 2010)**. "Generally, abandoned property may be recovered by police and used for evidentiary purposes." ***United States v. Simpson*, 439 F.3d 490, 494 (8th Cir. 2006)**. "Whether property has been abandoned is a question of fact that turns primarily on whether the objective facts available to the investigating officers evidenced (i) the suspect's denial of ownership, and (ii) that he physically relinquished the property in a way that demonstrated abandonment." ***Voice*, 622 F.3d at 878 n.3**. "The existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment

involuntary." *United States v. Liu*, 180 F.3d 957, 962 (8th Cir. 1999). Similarly, a subsequent unlawful seizure of the defendant does not change the analysis. **See** *Simpson*, 439 F.3d at 494.

In this case, Nash specifically made statements denying ownership of the handgun by stating he had not put a handgun in the snow. Additionally, whomever left the handgun in the snow clearly relinquished the property in a way that demonstrated abandonment. The handgun was left in an outdoor, open, common area without being concealed. Under these circumstances, abandonment of the handgun was a voluntary decision of Nash's free will. For the reasons stated above, Nash's motion to suppress should be denied. Accordingly,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Mack L. Nash's motion to suppress (Filing No. 14), as amended (Filing No. 16) be denied.

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 29th day of November, 2010.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.